Good morning, Your Honors. Joanna Schiavone on behalf of the appellant Robert Farrace. May it please the Court, I'm going to try to reserve three minutes for rebuttal and I'll keep my eye on the clock. So subject to the Court's other questions, I plan to focus my time today on the jury instruction issue. But obviously I'm happy to answer questions on any of the other issues. We've raised a number of complex sentencing issues as well, in addition to evidentiary challenges. So I think with respect to the jury instruction issue, and it's understandable how the District Court came to its conclusion that we contend is incorrect, because of the timeline of how Ninth Circuit law evolved in this case and what the law was at the time that the case was charged, and then the subsequent evolution of the law, which gets us to the point here today that the right jury instructions were not given in this case. So I'll spend just a moment going through that timeline and then expand on our contentions. So the indictment... I'm just not sure how you get past the idea that the half-truths here were actually misstatements. So maybe we can just jump to the chase on that because I think you're going to lead up to that. Right. So then that really gets to the point then about that the District Court was looking to the Burgoyne scenario, which is whether half-truths are affirmative misstatements versus the Spanier context where it's charged and then at trial and then argued fervently in closing argument as not enough information being provided. That not enough was disclosed, so the disclosure was deceitful and misleading because it didn't provide enough information. And that is, Your Honor, exactly what an omission is. And the Sixth Circuit, while the Ninth Circuit hasn't addressed that point of law, the Sixth Circuit in the Curleman case has said exactly that point of law, that a half-truth is by nature an omission. So I thought the government's theory, and you can point me to where in the record this isn't right, but I thought the government's theory was that your client had made it seem like he had no relationship with this company, and in fact it was really him, and that it wasn't really an omission. It was that the way he wrote the letters and things, it made it sound like he had no relationship, but in fact he did have a relationship. Well, the government now argues that that was its theory. But looking actually at the record, the theory that they put forth in the July 22, 2010 email, where Mr. Faraci indicated to Bank of America that he had a relationship in the past with Dignitas, the LLC that purchased the Roseburg property, and that he may have a future relationship. And so the government's theory at trial, and as it asked questions of witnesses and then made its closing argument, was that he made it seem like there was one scenario, but he didn't tell them enough to ask more. And so the theory really was that it failed to disclose. It failed to disclose information. And Mr. Faraci's theory at trial was that was the whole truth. He told them, because he was under no duty, and his expert testified at trial, there was no legal duty to say more, absent an inquiry from the lenders. And so his theory at trial was the email was the whole truth, and had the lenders wanted to know more, they could have asked, and he opened the door by saying, if you have any further questions, let me know. But their theory, and I'll point you to, because Judge Freeland, you asked where in the record, I'll point you to a number of places where that theory is evident. And we really summarized, I think, in... I mean, I'm looking at ER 898, where it says, Faraci's scheme to defraud the lenders by tricking them into thinking that someone else was lying. They were arguing that he just really essentially lied. Not that he sort of half told the truth. Well, so even if that's the attempt to present the case now, that's not how it came in as the evidence came in, and how it was argued. Well, that was closing argument. I was just ER 898, but maybe you have different points? Yes. So the government, and I'll point you to, in particular, the rebuttal. So, and going also to their closing argument, so ER 914, they point to that email, the email we're just talking about, saying that it identifies a statement, quote, I'm willing to proceed with the escrow. And that is the claim that they say the email is deceitful. In rebuttal, at ER 984, the government argues that, quote, that's a very small piece of what the truth is. His statements about Dignitas. Further in rebuttal, and this is the last thing then the jury gets to hear, further in rebuttal, the government says, quote, here are all the things that we talked about before in terms of his control of Dignitas, that he chooses, he chooses not to put in this disclosure to the bank. Right? There are many, many things in here the defendant leaves out, and he selects different words to give to continue giving the bank the money. So the theory really is, he didn't say enough. That when he started to speak, he had to say more. It's not that the words in the disclosure were themselves deceitful, it's that he had to say more. And I'll tell you that's How do you deal with the Escobar case? I mean, the Supreme Court talks about this kind of issue and says that when you do a partial truth, if you do it in a particular way so that it gives the wrong impression, it's actually a misstatement. And it seems like that's the same thing here. So here's where I think it differs in this case and how the evidence came in. There were three different witnesses that testified, these were government witnesses, all three of whom testified that the e-mail that's really at issue here actually did put the lenders on notice to ask more. That this was Ms. Erickson who was the first sort of line of defense. Well, but doesn't that get to the negligence? I mean, we've held that the negligence of the particular bank isn't admissible. Absolutely. And that's not the argument, Your Honor. What I'm trying to connect the dots, and as you point out from Escobar, I'm trying to get to what the theory was and how the evidence came in. Because keep in mind that we did not have Spanier at the time. And so the government, I think, because the case had been charged as no one disputes, I don't think Mr. Tierney will dispute, it was charged as a mixed case. And then the district court ruled based on Burgoyse but not having Spanier yet, the district court ruled if you were going to present omissions, you would have to get the Shields instructions, you would have to have a duty disclosed and fiduciary duty. And so the government then tried to cabin its case into this affirmative misrepresentation. But the real evidence as it really came in and those statements then that I read in rebuttal argument, I think really demonstrate that it was a, he did not disclose enough in that half-truth. And that's where I think the witness testimony is important. So it's not that the lender had a duty to investigate. We're not challenging that. What I'm trying to get at is the way the evidence came in, three different fact witnesses from the government all looked at the e-mail and said, are bad. It does, actually the words in there do, would put a reasonable person on notice. So that doesn't excuse conduct under wire fraud. But the point is that the jury then never had the benefit of, you know, making a case that was based on instructions, a legal frame that would have given them the benefit to weigh that evidence to say, did he have a duty to say more? And his expert said that in the industry this was very common behavior and that there was an absent and inquiry. What was common behavior? I mean, it's not common behavior to say you're doing a short sale to someone you're not related to, but you are related to. Actually, that's true. What the expert said was common was that banks often engage in short sales because they can be in their own interests, even if they're not arm's length. The expert also testified that there was sufficient disclosure in that e-mail to put a bank on notice to inquire further. And that Mr. Faraci did not, absent an inquiry, have a duty to say more. But what was common was the jury having the frame of the instruction to say, to evaluate the evidence and think, were they in a special relationship? Did he have a duty to say more? This, I think, is the point of what the Ninth Circuit has held in Shields and then building on that in getting to Spanier, is that when you have these overlapping charges and where there is, in essence here, the claim of a material omission being the heart of the deceit, and we say it is a material omission, you can go back to, again, ER 984, where the last thing the government says is he chooses not to put in this disclosure to the bank. There are many, many things in here the defendant leaves out. This was the crux of the theory, even if now creatively the theory is being reframed to say, no, it's an affirmative misrepresentation. And so the factual interpretation by those three fact witnesses at trial, that the e-mail said something that should have put them on notice to ask more, even if they didn't, I think that is very important. I think it's important that his expert said he had no further duty, but what is missing here is the jury not having the legal frame to weigh that. And frankly, what has... I mean, the Supreme Court has said that there are three roads in this house, and really there are three. And the Supreme Court says when you only mention two roads, and there are really three, even though it's an omission, it's really a false statement. And I just am still, even though you've been arguing very articulately, I'm having trouble understanding how this isn't an example of that. He gave the impression that he didn't have a relationship with this company. And he did. Well, but, Your Honor, again, I think that this is an issue that a jury needs to weigh in with respect to the proper instructions. And again, I would say, going back to the Curliman case's view of a half-truth being a type of omission, that really is what the proper frame is here. And frankly, all of this could be resolved, I think, if applying Spanier, and this case really is highly analogous to Spanier in terms of the way it was charged and then the way it was presented at trial. It's not analogous to the Burgoyne scenario or the Escobar scenario, where it is merely a false statement in the statement itself, the two roads versus three. The roads is not false. I mean, there are two roads. There just happens to be a third, is the example. And so it's not false. So then, but here again, I mean, our position is that the way the case was presented to the jury, the way the witnesses were examined by the government in its own case, and the way that they argued it, while attempting now creatively to reframe it, it was an omissions case. It was a scenario where they said, he spoke some, but he didn't speak enough. And that is a classic case where if he didn't speak enough, there had to be a duty to speak more. It's not, because his contention that the jury didn't get to properly weigh with the instructional frame was, it was the whole truth. He said, I had a relationship in the past, I may have a relationship in the future.  But the jury never had the benefit of weighing the facts against whether or not there was a relationship that would have given a rise to a duty to speak more. Your client testified. Yes. The jury didn't believe him. The judge didn't believe him. The judge said at sentencing, you know, you were a fraudster here, and your arguments are ridiculous. Is there any doubt that the jury knew exactly what they were doing? Well, Your Honor, I understand then the question, and correct me if I'm wrong, but you're getting really, if there's an error, is it harmless here? Was there enough evidence? No. I'm not even saying that. I'm saying everyone understood that these were misrepresentations and half-truths, not omissions, any more than if I say I'm a lawyer when I'm not a lawyer, I omitted saying I'm not a lawyer. No. I'm not sure, Your Honor, that I would completely agree with that. This is a complex case, and sitting, if I'm putting, if you're asking me to put myself in the shoes of a juror in weighing this, yes, they convicted, so they obviously lacked doubt with respect to the instructions and the legal frame they had. But given the expert's testimony that he had no other duty, and given what some of the fact witnesses said, and then the fact that the jury had no, this is the language that the jury should have, in our view, had that they did not have, the language is, to convict a defendant of wire fraud based on omissions of material fact, you must find that defendant had a duty to disclose the omitted facts arising out of a relationship of trust. That duty can arise either out of a formal fiduciary relationship or an informal trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and trust that the other party has, which it would ordinarily exercise. So if I was a juror sitting in that room, looking at that language, and had that instruction telling me, hmm, well, this is a lender and this is a seller, was there a trusting relationship there, I don't know that I would have gotten there. I don't know that we can say that 12 people would have gotten there. Absent that, the government made a compelling case. The jury convicted my client. No one disputes that, but they made a case, right? But the jury lacked this foundational element of, for it to be wire fraud, there had to be a duty to do something more than my client did. And so I really think we can't back into that, and clearly Judge O'Neill was frustrated, but then at sentencing, he acknowledged, I mean, the world sort of turned upside down, the market turned upside down, and so the losses here were not caused by my client's conduct, right? So he was still, I think Judge O'Neill was even balancing multiple factors there. But I'm not convinced that had the jury had that instruction, which is really critical, and I think this Court said in Shields how important it is, and in both Shields and Spanier, they were reversals, because the error, the instructional error was not harmless, and I think that is the exact scenario here. So I realize I'm in the red zone already. I'll give you two minutes for rebuttal. Thank you. Members of the Court, good morning. My name is Michael Tierney, and I represent the United States. The case presented to the jury, that the jury convicted on, was that Faraci made statements, and those statements were misleading. He mixed in a little bit of truth and held back far more important details to give a misleading impression to the lenders. That misleading impression was, I, who own two houses, am going to sell my houses to Dignitas, which is an independent company managed by Jim Hurley, when in fact Jim Hurley was a straw man, and Dignitas was Faraci all along. That was the government's theory from beginning to end. The government's opening statement began, and I was the one who gave the opening statement, so I remember what I said. This case involves the defendant tricking a bank into thinking that he was selling two houses to somebody else when he was really trying to sell them to himself. That's at ER 273. We quote it on page 26 of our answering brief, and a couple pages later I said, so in multiple communications with the bank, and in paperwork that he put into the bank, he made Dignitas look like an independent entity. So that's what it was all about, creating a misleading impression. And as opposing counsel stated, that July 2010 email was perhaps the key piece of evidence in the case. That was a statement, again not a silence by Mr. Faraci, a statement that he made to the bank via email, and it mixed in a little bit of truth, but the point was, and how the government argued that, was that those pieces of truth and the things that he left out were to serve the goal of being a bank, and one of the pieces that was argued in closing was that the July 2010 email was deceitful, because Faraci is showing something that he wants the bank to believe. That's a very small piece of what the truth is. It is not just that he is concealing some part of it, it is that he is twisting it and making it look like something that really isn't true. And that's at ER 984, quoted on pages 27 and 28 of our answering brief. Could I move you to a different issue that I struggled with more for your position, and that's the sentencing and the intended loss issue? Yes. It seems like the loss had happened because of the market, and at least on some view, Mr. Faraci understood this market and so knew that there wasn't going to be a loss, and I'm just having trouble understanding how he intended a loss under those circumstances. Yes, of course, Your Honor. So the district court's loss finding was based on intended loss, not actual loss. The district court found that there was no actual loss. On intended loss, what the district court did was it went back to the summer of 2010, and during that time, Faraci was communicating with the banks about the deficiency. So he owed $128,000 in unpaid principal on the Roseburg loan, and so that amount, that $128,000, was the $128,000. And so he's trying to negotiate this short sale, where he is saying, I'm going to sell my property to Dignitas for about $60,000. During the course of that negotiation, he asks them to essentially waive the deficiency, and so there's communications back and forth. But then they don't, and yet he does it anyway. So it's a little hard to see how that request matters very much. Well, because the point is that that negotiation could mean a couple of things. Now, what Faraci said it meant, what he said at trial, well, attempted to say at trial, but what he actually personally told the district judge at sentencing. He talked to the district judge, and this is what he said. He said, well, that's just confirmatory. I knew they didn't have any right to it. I knew they weren't going to ever recover it. I just wanted to make sure. Well, but that's not what they said. You know, they said, well, we won't go after you for it. And the point is that that was this July 2010 email. It does two things. It first spoke to this point, the deficiency, and then it made those misleading disclosures about his relationship with Dignitas. But as to the deficiency, so, I mean, in the forfeiture part of this case, you're now admitting that there really isn't a loss. So then in the loss part, if they had foreclosed on the house, they were going to lose at least most of the deficiency. So they did the short sale instead, and now they're going to lose the deficiency. And he knew that that was the tradeoff, and so they weren't losing anything. I just have, I'm just still having trouble understanding it. Sure. But we sometimes have at sentencing, there was no way the person could have committed the fraud because the government set the whole thing up as a sting. But the defendant didn't know that, and his intended loss is what he thought he was going to get out of the fraud. And so it doesn't have to be an actual loss. No, no, I understand that, but I think he understood, I guess my question is, I think he understood what was going on in the market, so did understand that it wasn't like a hidden sting. He knew that if they foreclosed on this house, it doesn't have much value. That was his position, Your Honor, and the district judge made a credibility determination otherwise. Again, so the district judge had heard all the evidence at trial, had heard Faraci's testimony, and what the judge said is, no, it's not that you knew they couldn't recover, you actually thought they could recover. So is the idea that even if, I guess, if there was a foreclosure and then sale on an auction, and it was only for $60,000, that the question is, could they still go after him later in that scenario, in a way that they could? Right, that's the whole difference here. And so again, where the two sides line up then at sentencing for the district court to make a fact determination is, did Mr. Faraci really think that there was no way the bank could get that money back, or did he think, there is a way they can get that money back, but not if I proceed with this case through fraud. If I do, and they do the short sale, and they've told me they're not going to go after it afterwards, then I'm good. So let me go ahead with my misleading disclosure and make this sale happen. So that was, while it's difficult because the court ultimately found no actual loss, Judge Lasnik is exactly correct, 2B1.1 directs unintended loss, that that includes loss that the defendant sought to inflict and includes harm impossible or unlikely to occur. Back in time, going back into that time machine in the summer of 2010, the district court had to make a credibility determination about what's in Mr. Faraci's mind, weighing all the facts it knew, and it did, and found that there was $128,000 in bond. Do you still stand by that there was no actual loss, and that we'll have to remand this case to vacate the order of forfeiture? Correct. It would have to be remanded for that limited purpose of vacating the order of forfeiture. I think that's right. And you still take that position? Yes, that's right. We acknowledge error in the forfeiture portion of the judgment. Yes. Subject to any other questions that the court might have, I will sit down. Thank you very much. Thank you. So, I will briefly touch on a couple of things the opposing counsel said with respect to the jury instruction issue, and then turn to the intended loss issue. I think it's even key and revealing when he says that the theory is he gave, quote, unquote, a little information, but held back far more information, and that the emailing question was a statement and not a silence. This court held in Spanier that it doesn't have to be a pure omissions case. It doesn't require only not speaking, and that was the theory from the government at the outset, even though they bobbed and weaved, when the law changed. And I would just ask the court to review both Spanier, which specifically holds that Shields is not limited to, quote, unquote, pure omissions cases, and it applies to mixed cases, where it's omissions, half-truths, and misrepresentations at issue. And then, again, the Curliman case. This, I think, is illuminating. Omissions are failures to speak half-truths in which the speaker makes truthful assertions but conceals unfavorable facts amount to one type of omission. That's exactly, I think, the scenario here, which is why we would fall under the rubric of Spanier. All we're asking for is that a jury fairly get instructed with respect to the law. We're not asking you to say that there's no potential liability here, but merely to reverse the judgment so we can have a fair trial. Mr. Tierney points to a factual finding, but I think the far more complex issue, and I think, Judge Friedland, you were getting to this, is the legal question and whether or not gain is even an appropriate finding here with respect to intended loss. And, actually, the Miller case from the Eighth Circuit is right on point. I didn't read the court as relying on gain, though. I mean, it seems like the question is, could the bank have, if in the alternative universe there had been a foreclosure and auction, could they have gone after the deficiency in a way that wouldn't normally happen on a short sale and that he was trying to make sure that they wouldn't come after him on a short sale that was fraudulent or something like that. And it seems like there was some basis for the district court to think he was trying to make sure that they wouldn't come after him later. I think, as Mr. Frachi had explained in his sentencing, and as I understand the record, it was that the form for Bank of America was a national form, and he was trying to pin down, there is California law, he knew California law, the judge said he understood, and he actually correctly understood California law. And so I think this really falls more in the initial part of your question about whether or not intended loss is even supported in this scenario here, because the bank didn't confirm it, and yet he went ahead anyway. And so that, not getting to intent, but I really would continue to advocate that gain really was. What the government argued and what the court actually did hook onto. And the reason for that, and then I'll close because I see I'm out of time, is that that is the only way we get to a loss here. Because, and actually I pointed out in the reply brief, multiple places throughout the case where the government frames it as gain in its sentencing memo more than once with respect to gain. He gained a benefit by not having any liability for potential deficiency. And the Miller case specifically says...
judges: Wallace, Friedland, Lasnik